## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF THE INTERIOR; U.S. FISH AND WILDLIFE SERVICE; DEBRA HAALAND, in her official capacity as SECRETARY OF THE INTERIOR; MARTHA WILLIAMS, in her official capacity as DIRECTOR OF THE U.S. FISH AND WILDLIFE SERVICE | § § § § § § § | Civil Action No. __7:24-cv-233__ |
| *Defendants*. | § | |

## COMPLAINT AND PETITION FOR REVIEW

Plaintiff, the State of Texas, files this Complaint against the United States Department of the Interior, Debra Haaland in her official capacity as Secretary of the Interior, the United States Fish and Wildlife Service, and Martha Williams in her official capacity as Director of the United States Fish and Wildlife Service, for violations of the Administrative Procedure Act ("APA") and the Endangered Species Act ("ESA") in listing the dunes sagebrush lizard ("Lizard") as endangered. Plaintiff alleges as follows:

## INTRODUCTION

1.     This is an action challenging the legality of the final administrative rule entitled "Endangered and Threatened Wildlife and Plants; Endangered Species Status for the Dunes Sagebrush Lizard" ("Final Rule"), promulgated by the defendant U.S. Fish and Wildlife Service ("Service"). The Final Rule was published on May 20, 2024, in Volume 89, Number 98 of the Federal Register. *Endangered and Threatened Wildlife and Plants; Endangered Species Status for the Dunes Sagebrush Lizard*, 89 Fed. Reg. 43,748 (May 20, 2024) (to be codified at 50 C.F.R. § 17.11). A true and correct

copy of the Final Rule is attached as Exhibit 1. Prior to adopting the Final Rule, the Service published its proposal to list the Lizard as endangered ("Proposed Rule"). *See Endangered and Threatened Wildlife and Plants; Endangered Species Status for the Dunes Sagebrush Lizard*, 88 Fed. Reg. 42,661 (July 3, 2023). A true and correct copy of the Proposed Rule is attached as Exhibit 2.

2.     The Service failed to rely on the best scientific and commercial data available when it designated the dunes sagebrush lizard as endangered. Because the Service lacks information about the Lizard's range-wide population size, it instead relied on a habitat model to indirectly estimate the Lizard's population and viability. And in assessing the Lizard with this model, the Service made inaccurate and arbitrary assumptions about the current status of the species, relying on those assumptions to make equally inaccurate and arbitrary predictions about its future status. In fact, the Service concedes the Lizard still occupies much of its range and that it may persist over the next several decades—concessions that undercut the Service's listing of the Lizard as endangered.

3.     The Service also fails to adequately consider existing voluntary conservation efforts in place to protect the dunes sagebrush lizard. In summarily and arbitrarily ignoring these conservation efforts, such as the Texas Conservation Plan for the Dunes Sagebrush Lizard and the more recent 2020 Candidate Conservation Agreement with Assurances, the Service ignored its own Policy for Evaluation of Conservation Efforts.

4.     The Final Rule is also improperly vague due to its failure to provide the public with adequate guidance regarding activities that can and cannot occur within the dunes sagebrush lizard's large geographic range, which overlaps with the Permian Basin—an economically vital area for the State of Texas. Texas agencies, industry, and private landowners are left without any regulatory certainty regarding the types of activities that may violate the ESA.

5.     The State of Texas, including various State agencies, has worked together with private landowners and industry partners to implement voluntary conservation measures to manage, conserve,

and recover the dunes sagebrush lizard. The ability to manage wildlife resources at the state level is especially important in Texas, where most land is privately owned. Texas's collaboration with private landowners to achieve conservation while enabling economic development is crucial to the success of conservation efforts. The Final Rule threatens to derail these efforts. And because it violates the Administrative Procedure Act and the Endangered Species Act, the Final Rule must be vacated.

## THE PARTIES

### A.  Plaintiff

6.      Plaintiff the State of Texas, by and through its Attorney General, brings this suit to assert the rights of the State, including agencies of the State, and on behalf of its citizens. *See* Tex. Const. art. IV, § 22; Tex. Gov't Code, Ch. 402.

7.      The Texas General Land Office is a constitutionally created agency of the State of Texas empowered to supervise and manage state-owned lands dedicated to the Permanent School Fund. Tex. Const. art. VII, § 1; Tex. Nat. Res. Code § 31.051. The Texas General Land Office manages millions of acres of state-owned lands and mineral interests to generate revenue for the Permanent School Fund—a constitutionally created fund that collects and distributes hundreds of millions of dollars annually for the support of public schools. Tex. Const. art. VII, § 2.

8.      The Texas General Land Office's interest in managing the Permanent School Fund is harmed by the decision to list the dunes sagebrush lizard under the ESA. The Lizard's range significantly overlaps with the land and mineral resources owned and managed by the General Land Office.  The Final Rule will limit or outright prohibit the leasing of its land for energy production, which in turn reduces revenue for the support of public schools and higher education. This injury is actual and concrete, caused by the Service's decision to list the Lizard, and will continue unless the Court grants relief. Accordingly, the relief sought would redress the State's injury. *See* Declaration of Robert Hatter, Exhibit 3.

9.      The Texas Department of Agriculture is an agency of the State of Texas charged with the proper development and promotion of agriculture, horticulture, and other industries that grow, process, or produce products in Texas. Tex. Agric. Code § 12.002. The Texas Department of Agriculture also regulates the distribution, application, and use of pesticides and herbicides, which includes registering pesticides for sale in the state, the education and licensing of pesticide applicators, and handling complaints filed against pesticide applicators. In addition, the Texas Department of Agriculture is responsible for protecting the state's agriculture industry from invasive species and harmful pests.

10.      The Texas Department of Agriculture's interest in developing and promoting agriculture and regulating pesticides is harmed by the decision to list the dunes sagebrush lizard under the ESA. The Lizard's range significantly overlaps with farms and ranches in Texas. Restrictions within the Lizard's range will lead to a reduction of current cropland or conversion of cropland to idle acreage or rangeland and inhibit or dampen farmers' plans to expand acreage used to cultivate crops or make infrastructure improvements to farming operations. Restrictions will also affect ranchers' ability to grow or purchase crops to feed animals or use pastureland to feed animals within the Lizard's range. The restriction of pesticide use in the Lizard's habitat may drive applicators to use pesticides registered by the Texas Department of Agriculture in an off-label manner or to use pesticide brands not regulated by the Texas Department of Agriculture, which puts a strain on the agency's regulatory responsibility to minimize the impacts of pesticide application, including on endangered species. In fulfilling its regulated duties related to pesticide usage within the State, the Texas Department of Agriculture will be required to enhance monitoring to ensure compliance. This injury is actual and concrete, caused by the Service's decision to list the Lizard and will continue unless the Court grants relief. Accordingly, the relief sought would redress the State's injury.

11.     The Railroad Commission of Texas is an agency of the State of Texas responsible for the control and disposition of waste and the abatement and prevention of pollution of surface and subsurface water resulting from activities associated with the exploration, development, and production of oil or gas or geothermal resources, and charged with administering the drilling and operation of oil and gas wells in Texas for the prevention of waste and protection of correlative rights. Tex. Nat. Res. Code §§ 81.051, 85.045–85.046, 86.011–86.012. The Railroad Commission of Texas protects the environment from discharges associated with oil, gas, geothermal, and surface mining activities. Tex. Water Code § 26.131. The Railroad Commission of Texas is also responsible for plugging abandoned oil and gas wells and cleaning up and remediating abandoned oil and gas sites for which the responsible party fails or refuses to take action or is unknown, deceased, or bankrupt, or where a leaking well is likely to cause a serious threat of pollution or injury to public health. *See* Tex. Nat. Res. Code §§ 81.068, 89.043.

12.     The Railroad Commission of Texas's interest in well-plugging and remediation activities is harmed by the decision to list the dunes sagebrush lizard. The range of the Lizard overlaps with the oil and gas producing areas of Texas, and lizards may be present in areas where wells have been abandoned and little infrastructure exists on the surrounding landscapes that would cause avoidance. The Railroad Commission of Texas cannot proceed with well plugging activities without significant delay, increased expense, or outright prohibition as a result of the Final Rule. This injury is actual and concrete, caused by the Service's decision to list the Lizard, and will continue unless the Court grants relief. Accordingly, the relief sought would redress the State's injury. *See* Declaration of Travis Baer, Exhibit 4; Declaration of Peter G. Pope, Exhibit 5.

13.     The Permanent University Fund ("PUF") is a constitutionally created public endowment that contains over 2.1 million acres of land ("PUF Lands") primarily located in 19 counties in west Texas that benefit more than 20 educational and health institutions of Texas. Tex. Const. art.

VII, § 11. The Board of Regents of the University of Texas System has the sole and exclusive management and control of the PUF Lands. Tex. Educ. Code § 66.41. The Board for Lease of University Lands is responsible for leasing PUF Lands for oil and gas exploration and development and setting the terms of contracts for development. The Board for Lease of University Lands is comprised of members of the Board of Regents of the University of Texas System, the Texas A&M University Systems, and is chaired by the Commissioner of the Texas General Land Office. *Id.* § 66.62. The mission of the Board of Regents of the University of Texas System, enacted through University Lands, is to maximize the revenue of the PUF Lands while simultaneously promoting awareness and sensitivity for the environment. In keeping with these purposes, the lands are sustainably managed to produce two streams of income: one from oil, gas, and mineral interests; and the other from surface interests such as grazing, agriculture, midstream, and renewable energy.

14.     The Lizard's range significantly overlaps with the PUF Lands. The Final Rule will limit or outright prohibit the leasing of certain PUF Land for energy production and other surface use, which in turn reduces revenue for the support of educational and health institutions of Texas. This injury is actual and concrete, caused by the Service's decision to list the Lizard, and will continue unless the Court grants relief. Accordingly, the relief sought would redress the State's injury.

**B. Defendants**

15.     Defendant Department of the Interior is a federal agency within the meaning of the APA. *See* 5 U.S.C. § 551(1). The Department of the Interior is charged with administering the ESA. 16 U.S.C. §§ 1531–1544.

16.     Defendant Debra Haaland is the Secretary of the Interior and is sued in her official capacity. Secretary Haaland, in her capacity as Secretary of the Interior, is ultimately responsible for the Service's actions under the ESA.

17.     The U.S. Fish and Wildlife Service is a federal agency within the meaning of the APA. *See* 5 U.S.C. § 551(1).  The Service is an agency within the Department of the Interior. The Secretary of the Interior has delegated the implementation of the ESA, including listing decisions, to the Service.

18.     Defendant Martha Williams is the Director of the Service and is sued in her official capacity. Director Williams is responsible in her official capacity for the Service's actions under the ESA.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (Administrative Procedure Act), and 16 U.S.C. § 1540(g) (Endangered Species Act). There is a present and actual controversy between the parties, and Plaintiff is challenging a final agency action pursuant to 5 U.S.C. §§ 551(13) and 704. This Court can grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

20.     Venue is proper in this Court under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because: (1) Plaintiff State of Texas and its agencies are residents of this judicial district; and (2) the dunes sagebrush lizard and its current and historical range are located within this district.

21.     On July 25, 2024, Plaintiff notified the Service in writing by email and certified mail of its intent to file this suit if the Service did not correct the deficiencies noted in the Final Rule. The notice letter is included as Exhibit 6. The Service did not address the issues identified in Plaintiff's letter within 60 days.

## LEGAL FRAMEWORK

## The Administrative Procedure Act

22.     The APA governs the federal rulemaking process and sets the standards applicable when federal agencies propose and adopt final rules and regulations. 5 U.S.C. §§ 553, 551(4).

23.     The APA provides for judicial review of final agency actions by persons adversely affected by such actions. 5 U.S.C. § 702. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). A final agency action may be held unlawful and set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). A reviewing court shall also "hold unlawful and set aside agency action, findings and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

24.     A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

25.     If an agency changes its position, it "must provide a reasoned explanation" for the change. *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). "Such an action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.*

### The Endangered Species Act

26.     The purpose of the ESA is "to provide means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species[.]" 16 U.S.C. § 1531(b).

### *Listing a Species*

27.     Before a species receives protection under the ESA, it must be listed as "threatened" or "endangered." A "threatened" species is "any species which is likely to become an endangered

species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

28.     The term "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

29.     A species may be listed as endangered if any of the following factors are present:

A.     The present or threatened destruction, modification, or curtailment of its habitat or range;

B.     Overutilization for commercial, recreational, scientific, or educational purposes;

C.     Disease or predation;

D.     The inadequacy of existing regulatory mechanisms; or

E.     Other natural or manmade factors affecting its continuing existence.

16 U.S.C. § 1533(a)(1).

30.     A determination to list a species must be based on the "best scientific and commercial data available" and shall take into account any efforts being made by any state to protect the species. *Id.* § 1533(b)(1)(A).

31.     For each listing determination, the Service must publish in the Federal Register a summary of the data on which the listing determination is based and show the relationship of the data to the determination. *Id.* § 1533(b)(8).

**Consequences of Listing a Species**

32.     "Endangered" species are protected by Section 9 of the ESA, which, among other things, makes it unlawful for any person to "take" such a species. *See Id.* § 1538(a)(1)(b).

33.     The term "take" means to "harass, harm, hunt, pursue, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19). "Harm" is defined to

include significant habitat modification or degradation if it results in the death or injury to a listed species by significantly impairing essential behavior patterns including breeding, feeding, or sheltering. 50 C.F.R. § 17.3.

34.     Depending on the needs of an individual species, the "take" prohibition can mean an outright prohibition or significant limitation on certain activities on land that contain habitat for the species. For example, farming, oil and natural gas drilling, renewable energy development, grazing livestock, or other activities may be prohibited if they modify existing habitat or "harass" the species in some way. "Harass" is defined as an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*

**Designation of Critical Habitat**

35.     The ESA requires the Service to designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact … and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). A species' "critical habitat" is the specific area within its range that is "essential to the conservation of the species and … which may require special management considerations or protection." *Id.* § 1532(5)(A).

**Evaluation of Conservation Efforts in Listing Decisions**

36.     The ESA also requires the Secretary to consider any conservation efforts, such as protection of habitat and food supply, being made by States or political subdivisions to protect the species. *Id.* §1533(b)(1)(A). To ensure consistent and adequate consideration of such efforts, the Service has issued a formal Policy for Evaluation of Conservation Efforts When Making Listing Decisions ("PECE Policy"). 68 Fed. Reg. 15,100–01 (Mar. 28, 2003). The PECE Policy "identifies criteria [the Service] will use in determining whether formalized conservation efforts that have yet to

be implemented or to show effectiveness contribute to making listing a species as threatened or endangered unnecessary." *Id.* at 15,100.

37.     The PECE Policy identifies two key factors for evaluating whether certain conservation efforts improve the status of the species under the ESA: "(1) for those efforts yet to be implemented, the certainty that the conservation effort will be implemented; and (2) for those efforts that have not yet demonstrated effectiveness, the certainty that the conservation effort will be effective." *Id.* at 15,114. The PECE Policy directs the Service to determine the "certainty that the conservation effort will be implemented" based on nine criteria and the "certainty that the conservation effort will be effective" using six criteria. *Id.* at 15,115.

38.     One of the primary vehicles for conservation efforts is a Candidate Conservation Agreement with Assurances ("CCAA"), which is a voluntary agreement that provides incentives for private landowners to implement conservation measures.[1] *Candidate Conservation Agreements with Assurances*, U.S. Fish & Wildlife Service, https://www.fws.gov/service/candidate-conservation-agreements-assurances (last visited Sept. 18, 2024); *see also* 50 C.F.R. § 17.32(d). In return for a participant implementing the conservation measures, the Service issues an Enhancement of Survival Permit under section 10(a)(1)(A) of the ESA, which provides assurances to the participant in the event that the species is subsequently listed as endangered or threatened. *Id.*

---

[1] As of May 13, 2024, the Service finalized new regulations combining CCAAs and Safe Harbor Agreements into a single, new agreement called a Conservation Benefit Agreement. However, existing CCAAs will not be converted to a Conservation Benefit Agreement until it is amended, or the associated permit expires. *See Endangered and Threatened Wildlife and Plants; Enhancement of Survival and Incidental Take Permits*, 89 Fed. Reg. 26,070 (Apr. 12, 2024).

## BACKGROUND

### A.     The Dunes Sagebrush Lizard

39.     The dunes sagebrush lizard (*Sceloporus arenicolus*) is a North American species of spiny lizard found in New Mexico and Texas. The Lizard is considered by the Service to be a habitat specialist with a dependence on shinnery oak duneland habitat. Final Rule, 89 Fed. Reg. at 43,758. As a result, the Lizard is prevalent in the shinnery oak dunelands and shrublands of the Mescalero and Monahans Sandhills in southeastern New Mexico and western Texas. *Id.* The Mescalero and Monahans Sandhills ecosystems are composed of ancient sand dune fields maintained by wind and shifting sand and are partially stabilized by shinnery oak. *Id.* Within the sand dunes, the Lizard relies on open dune blowouts, which are bowl-shaped depression that form when disturbances remove stabilizing vegetation. *Id.*

40.     Based on historical estimates, the shinnery oak duneland and shrubland landscape covers approximately 985,000 acres in Texas. U.S. Fish and Wildlife Service, Species Status Assessment for the Dunes Sagebrush Lizard, April 2024 ("SSA Report") at 19. The dunes sagebrush lizard's distribution within this landscape is fragmented by both anthropogenic development and natural landscape barriers. *Id.*

41.     The dunes sagebrush lizard is subdivided into three primary, spatially discrete lineages that have evolved in isolation since their initial founding: Northern Mescalero Sandhills, Southern Mescalero Sandhills, and the Monahans Sandhills. Final Rule, 89 Fed. Reg. at 43,760. The Mescalero Sandhills are almost entirely found in North Mexico, while the Monahans Sandhills is exclusive to west Texas. *Id.*; *see also* SSA Report at 52. These three lineages cover different portions of the Lizard's range and, as the Service acknowledges, are subject to different environmental conditions. Final Rule at 89 Fed. Reg. at 43,760.

42.     Most adult dunes sagebrush lizards live for two to four years and reproduce in the spring and summer months. *Id.* at 43,758. Females establish their nests underground in shinnery oak duneland vegetation, where they lay an average of five eggs in a clutch (i.e., one nesting attempt). *Id.* Eggs and young Lizards tend be susceptible to natural mortality from environmental stress and predation. *Id.*

**B.     The Service's 2010 Attempt to List the Dunes Sagebrush Lizard**

43.     In 2010, the Service proposed to list the dunes sagebrush lizard as an endangered species. *Endangered and Threatened Wildlife and Plants; Endangered Status for Dunes Sagebrush Lizard*, 75 Fed. Reg. 77,801 (Dec. 14, 2010). In the proposed listing, the Service noted that "critical habitat for the dunes sagebrush lizard is prudent but not determinable at this time." *Id.* The original comment period ended on February 14, 2011. *Id.* However, because of "substantial disagreement regarding the sufficiency or accuracy of the available data," Proposed Rule, 88 Fed. Reg. at 42,663, the proposed listing was subject to multiple comment periods, as well as public hearings, and did not finally close until March 12, 2012. *Endangered and Threatened Wildlife and Plants; Withdrawal of the Proposed Rule to List Dunes Sagebrush Lizard*, 77 Fed. Reg. 36,872, 36,875 (June 19, 2012).

44.     Ultimately, the Service withdrew the proposed rule in 2012 after concluding the threats to the species were "no longer as significant as believed." *Id.* at 36,872. Instead, the Service found "the best scientific and commercial data available indicate that the threats to the species and its habitat have been reduced to the point that the species does not meet the statutory definition of an endangered or threatened species." *Id.* Notably, as part of the rulemaking, the Service used its Policy for Evaluation of Conservation Efforts to evaluate recent conservation measures, including the Texas Conservation Plan for the Dunes Sagebrush Lizard ("TCP"). The Service concluded there was a high degree of certainty that the TCP would be implemented and "be effective at reducing and eliminating threats to

the dunes sagebrush lizard to the point that the species no longer meets the definition of threatened or endangered." *Id.* at 36,898–99.

**C.     The Ongoing Efforts to Conserve the Dunes Sagebrush Lizard**

45.     In 2011, the Texas Comptroller of Public Accounts ("Comptroller"), in collaboration with various stakeholders that included State agencies and industry representatives, developed the Texas Conservation Plan for the Dunes Sagebrush Lizard in support of a Conservation Candidate Agreement with Assurances. The TCP, which was finalized and approved by the Service in 2012, is a voluntary conservation program with the goal of promoting conservation of the Lizard while also facilitating continued and uninterrupted economic activity in the Permian Basin. The TCP authorizes the incidental taking of the Lizard resulting from oil and gas development, agriculture, and ranching activities and established a conservation program focused on avoiding these activities in the Lizard's habitat. Final Rule, 89 Fed. Reg. at 43,763.

46.     The Comptroller sought to revise the TCP in 2018 to further achieve the plan's conservation and protection goals. However, the Service rejected the proposed revisions to the CCAA submitted by the Comptroller and instead revised and transferred the TCP to a new permittee, the American Conservation Foundation, in 2020. *Id.* Notably, the Service acknowledges in the Final Rule it is unsure of the extent of the implementation of conservation measures under the revised TCP. *Id.* at 43,764.

47.     In addition to the TCP, a separate voluntary conservation plan was developed in 2020 by various stakeholders, including representatives from the sand mining industry ("2020 CCAA"). The 2020 CCAA covers oil and gas activities, sand mining, linear infrastructure, wind and solar energy development, local governments, and agriculture and ranching. *Id.* The goal of the 2020 CCAA is to contribute to the conservation of the dunes sagebrush lizard by reducing or eliminating

threats by: conserving the Lizard's habitat, restoring and reclaiming impacted areas, reducing habitat fragmentation, and addressing surface impacts from the development of stratified mineral estates. *Id.*

48.     The Service issued an Enhancement of Survival Permit for the 2020 CCAA in January 2021. As of February 29, 2024, seven participants had enrolled in the plan, covering at least 34,000 acres of land within the Lizard's habitat. The Service acknowledges it is currently unaware of the specific conservation measures being implemented by each participant. *Id.*

## D.     The Service's Latest Proposal to List the Species

49.     On June 1, 2018, non-profit organizations petitioned the Service to list the dunes sagebrush lizard as endangered or threatened and to designate a critical habitat. Proposed Rule, 88 Fed. Reg. at 42,663. In response, the Service published its 90-day finding that the petition presented "substantial scientific or commercial information indicating that listing the species may be warranted." *Id.*

50.     The petitioning organizations then sued the Service on May 19, 2022, for failing to complete the 12-month finding as required under the ESA. *Id.* To settle that complaint, the Service entered into an agreement with the petitioning organizations requiring the Service to submit the 12-month finding for the Lizard by June 29, 2023. *Id.*

51.     On July 3, 2023, the Service issued the proposed rule to list the dunes sagebrush lizard as endangered, which also served as the 12-month finding on the Lizard. *Id.*

52.     The Service received numerous comments on the Proposed Rule, including comments from the General Land Office, Railroad Commission, and Texas Department of Agriculture.[2] The State agency comment letters are included in Exhibit 7.

---

[2] Letter from Texas General Land Office, to U.S. Fish and Wildlife Service, Aug. 25, 2023, Docket ID No. FWS-R2-ES-2022-0162-0001[hereinafter "GLO Comment Letter"]; Letter from Railroad Commission of Texas, to U.S. Fish and Wildlife Service, Sept. 29, 2023, Docket ID No. FWS-R2-ES-2022-18361 [hereinafter "RRC Comment Letter"]; Letter from Texas Department of Agriculture, to U.S. Fish and Wildlife Service, Oct. 2, 2023, Docket ID No. FWS-R2-ES-2022-0162-18361 [hereinafter "TDA Comment Letter"].

## FINAL RULE

53.    On May 20, 2024, the Service finalized its endangered species listing for the dunes sagebrush lizard, with an effective date of June 20, 2024. Final Rule, 89 Fed. Reg. at 43,748. The Service's listing determination is premised on arbitrary and unreasonable assumptions about the Lizard's status that are not based on the best available data, while also failing to adequately consider existing voluntary conservation measures.

**A.     The Service Failed to Make Its Determination Solely on the Basis of the Best Available Data.**

54.    The Service's biological review of the current status of the dunes sagebrush lizard is contained in its Species Status Assessment Report ("SSA Report"). *Id.* According to the Service, the SSA Report represents a compilation of the best scientific and commercial data available concerning the status of the Lizard. *Id.* at 43,748. The Service assessed the viability of the Lizard using the conservation biology principles of *resiliency* (the ability to withstand environmental and demographic stochasticity), *redundancy* (the ability to withstand catastrophic events), and *representation* (the ability to adapt to both near-term and long-term changes in the physical and biological environment). *Id.* at 43,759.

55.    The Service's viability assessment was based on the availability and quality of the Lizard's habitat across its range rather than on its population size and range-wide occupancy. *Id.* at 43,750. The Service acknowledges it lacks information regarding the range-wide population size for the Lizard, in part due to the dynamic nature of the Lizard's population. SSA Report at 39. The Service points to "differences in land access, survey protocols, and survey intensity across the range in New Mexico and Texas" as reasons for the difficulty in developing population estimates for the Lizard. *Id.* In Texas specifically, the Service identifies "limited access to private lands" as a reason for the limited or otherwise lacking survey data. *Id.* at 43. However, the Service did review multiple studies evaluating the Lizard's population viability in New Mexico, which potentially could have been used as a basis for

estimating the Lizard's demographics. *See id.* at 39. Nevertheless, the Service decided to not rely on these studies, concluding that the population estimates of one such study "are likely overestimates." Final Rule, 89 Fed. Reg. at 43,751.

56.     Instead, the Service used its own refined habitat model as a surrogate for estimating the Lizard's population. SSA Report at 92. This model indirectly estimates the Lizard's population based on the presence of the shinnery oak duneland habitat. The Service utilized this model because it determined the Lizard is a "habitat specialist that only occurs within the shinnery oak duneland ecosystems." *Id.* at 14. But the Service acknowledges that this method "provides an indirect measure of [the Lizard's] resiliency since it equates the presence of habitat with the presence of the species" and "the presence of habitat [does not guarantee] the presence of the [Lizard]." *Id.* at 90.

57.     This refined habitat model serves as the Service's foundation for assessing the current and future status of the species. As a result, the Service's endangered determination for the Lizard is based on the present and likely future condition of the shinnery oak duneland habitat, and *not* on the condition or viability of the species itself.

1.  **The Service's Refined Habitat Model Is Not Based on the Best Available Data and Fails as a Reliable Surrogate to Evaluate Habitat Availability.**

58.     To assess the availability of the dunes sagebrush lizard's habitat, the Service looked to existing habitat models. The Service considered models developed by Hardy *et al.* (2018) and Johnson *et al.* (2016) to classify the Lizard's habitat in different areas of its range. *Id.* However, the Service decided to refine these models and develop its own model defining two habitat categories: (1) Shinnery Oak Duneland and (2) Shinnery Oak Supportive Habitat. *Id.* at 91.

59.     The Shinnery Oak Duneland habitat is considered by the Service to be "the top-quality habitat that the species uses most for breeding, feeding, and sheltering." Final Rule, 89 Fed. Reg. at 43,756. This category only includes areas with less than 10 percent mesquite cover in New Mexico and less than five percent mesquite cover in Texas. The Service attributes this difference in percentages

between the two States "due to data availability and the resulting habitat categories defined by the separate mapping efforts for each portion of the dunes sagebrush lizard's range." *Id.* This difference only serves to highlight how the Service's habitat model is arbitrary.

60.    In addition to arbitrarily categorizing the Texas habitat differently than the New Mexico habitat, the Service ignores data indicating the Lizard's habitat extends to areas with higher percentages of mesquite cover. For example, the Hardy *et al.* (2018) study documented the Lizard's occurrence in areas with a substantially higher percentage of honey mesquite cover. *See* SSA Report at 90 (including areas with less than 25 percent mesquite in its habitat classification, in contrast to the five percent used in the Service's classification for Texas). The Service's decision to omit those areas from its habitat category was arbitrary.

## 2. The Service's Habitat Quality Classification Improperly Relies on Arbitrary Metrics About Oil and Gas Development.

61.    In addition to its arbitrary assessment of the dunes sagebrush lizard's habitat *availability*, the Service similarly evaluated the Lizard's habitat *quality* using arbitrary metrics and flawed assumptions. The Service specifically identified habitat loss, fragmentation, and degradation from oil and gas development as one of the primary threats to the Lizard's habitat. Final Rule, 89 Fed. Reg. at 43,748. To assess the impact of oil and gas development, the Service developed multiple categories to represent the Lizard's habitat quality under different levels of development, as well as historic herbicide usage:

- *Minimally Disturbed* (habitat with <5 well pads/mi² and no history of herbicide spraying);
- *Disturbed* (habitat with 5-12 well pads/ mi² and no history of herbicide spraying);
- *Degraded* (≥13 well pads/ mi² and/or history of herbicide spraying); and
- *Non-Habitat Habitat* (human development devoid of habitat).

SSA Report at 93–94.

62.     These habitat-quality categories are purportedly based on oil and gas well pad density. *See id.* However, this density metric is primarily derived from a 1998 study conducted prior to the relatively recent development and prevalence of horizontal drilling in Texas. *See* SSA Report at 92; *see also Horizontally Drilled Wells Dominate U.S. Tight Formation Production*, Today in Energy (June 6, 2019), https://www.eia.gov/todayinenergy/detail.php?id=39752 (finding the percentage of horizontal well production in the Permian Basin rose from approximately 4% in 2004 to approximately 93% in 2018). With this advance of horizontal drilling, many wellheads can be clustered together at a single well pad, resulting in the use of fewer well pads. As a result, the 1998 study improperly conflates "well density" with "well pad density." This is important because fewer well pads (i.e., lower well pad density) means less surface disturbance, and therefore less potential disturbance to the Lizard's habitat.

63.     Although the Service acknowledged this issue in the Final Rule and made conforming changes in both the Final Rule and the SSA Report, its decision to list nonetheless still relies on the conclusions from this 1998 study. *See* Final Rule, 89 Fed. Reg. at 43,749, 51–52. Furthermore, the study itself found that areas with well densities of 13.63 wells/mi$^2$ were not a threat to the Lizard's viability and concluded that "regions of well density greater than 25 [wells]/mi$^2$ support substantial populations" of the Lizard. Sias, Don and Snell, Howard, *The Sand Dune Lizard Sceloporus arenicolus and Oil and Gas Development in Southeastern New Mexico* 23 (1998). Accordingly, the Service's determination that areas with greater than 13 well pads per square mile are indicative of degraded habitat is arbitrary.

### 3. The Service's Conclusion That Frac Sand Mining Poses a Serious Risk Is Arbitrary and Lacks a Factual Basis.

64.     The Service also identified habitat loss, fragmentation, and degradation from the frac sand mining industry as one of the primary threats to the Lizard's habitat. Final Rule, 89 Fed. Reg. at 43,748. The Service specifically cites to the "extensive surface disturbance caused by the mining process" as support for its conclusion that frac sand mining poses a threat to the Lizard's habitat. *Id.* at 43,753.

65.     As the Service acknowledges, frac sand mining is a relatively new activity and only became prevalent in west Texas in 2017. *Id.* As a result, there is little data evaluating the effects of frac sand mining on the Lizard or shinnery oak dune habitats. Indeed, the Service recognizes "[t]here are currently no peer-reviewed studies on the impacts of sand mines on the dunes sagebrush lizard." *Id.* And it acknowledges "it is difficult to make projections for such a young industry for which there is little available information on the patterns and practices of sand mines collectively." Proposed Rule, 88 Fed. Reg. at 42,664. Despite these acknowledged uncertainties, the Service nonetheless determined that frac sand mining is a primary threat to the Lizard's habitat.

### 4.  The Service's Assessment of Future Habitat Conditions Is Speculative and Not Based on the Best Available Data.

66.     As part of its habitat-quality assessment, the Service projected the effects of future oil and gas development on the Lizard's habitat. However, this projection of future conditions is based on the same outdated assumptions regarding well pad density and is therefore inherently compromised for the same reasons. Additionally, the Service's reliance on Pierre *et al.* (2020) to project future landscape alteration due to oil and gas development is similarly flawed. *See* SSA Report at 114. The Pierre *et al.* (2020) study, even though published in 2020, relies on historical drilling data, with 76% of the wells included in the data set being drilled before 2008. Pierre, J.P., *et al.*, *Projected Landscape Impacts from Oil and Gas Development Scenarios in the Permian Basin, USA* (2020). Therefore, the Pierre *et al.* (2020) study, and the conclusions drawn from it, do not represent contemporary drilling practices and certainly cannot accurately project future oil and gas impacts on the Lizard's habitat.

67.     Similarly, the Service asserts climate change is a factor "that *may* influence the condition of [the Lizard] in the future." SSA Report at 113 (emphasis added). This speculative, unsupported conclusion falls far short of the ESA's requirement that the endangered determination be based "*solely* on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). The Service itself concedes in the Final Rule that the effects of climate change on

individual Lizards are "relatively unknown." Final Rule, 89 Fed. Reg. at 43,762. And the SSA Report, which represents a compilation of the best available data, notes that climate change was not quantitatively incorporated into projections of future viability because the Service did not have sufficient information to do so. SSA Report at 113. Therefore, the best available data does not provide a non-speculative basis to predict any real, predictable, or measurable impacts that may or may not be associated with climate change risks on the Lizard's habitat.

     **5.  Ultimately, the Best Available Data Does Not Support the Service's Determination that the Lizard Is "Endangered" under the ESA.**

     68.    The Service's determination to list the dunes sagebrush lizard as an endangered species is undercut by its recognition that the Lizard is not, in fact, in danger of extinction throughout all or a significant portion of its range. The Service concedes that the Lizard "still occupies much of its range" and that it "may persist over the next several decades" even in areas the Service determined to be highly degraded. Final Rule, 89 Fed. Reg. at 43,766. Further, the SSA Report ultimately concludes that the Lizard's habitat is sufficient to support viable populations of the Lizard and habitat conditions will continue to support Lizard populations through 2050. *See* SSA Report at 131. Therefore, it is not consistent with the ESA or the best available data to conclude that the Lizard is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

**B.  The Service Failed to Adequately Consider Existing Voluntary Conservation Measures.**

     69.    The Proposed Rule described existing voluntary conservation measures, including the TCP and the 2020 CCAA, but failed to describe how the Service took those measures into consideration when making its listing determination for the dunes sagebrush lizard. *See* Proposed Rule, 88 Fed. Reg. at 42,671–73. Only in its response to comments in the Final Rule did the Service attempt to explain why it disregarded these conservation measures. *See* Final Rule, 89 Fed. Reg. at 43,749–50.

     70.    The Service acknowledges the existing voluntary conservation measures "have provided, and continue to provide, many conservation benefits" for the Lizard. *Id.* at 43,750. Similarly,

the Service recognizes that both the TCP and the 2020 CCAA "promote avoidance and minimization of impacts" to the Lizard's habitat. *Id.*

71. However, the Service emphasizes the decreased enrollment in the TCP over the past several years as evidence the plan is not performing as expected. *Id.* The Service also notes that the plan still allows development within the Lizard's habitat so long as mitigation measures are applied. *Id.* Despite acknowledging that participation in the TCP requires implementation of conservation measures, and despite acknowledging it is "unsure of the extent of conservation measure implementation and the locations of all areas where conservation is occurring," the Service nonetheless summarily concludes the measures provide little conservation benefit. *Id.* at 43,750. This is in stark contrast to the Service's conclusion in the 2010 rulemaking that it has high certainty that the TCP "will be effective at reducing and eliminating threats to the dunes sagebrush lizard to the point that the species no longer meets the definition of threatened or endangered." 77 Fed. Reg. 36,899.

72. The Service similarly concludes the 2020 CCAA has not yet demonstrated it "will be adequate or effective at protecting the dunes sagebrush lizard or its habitat in Texas into the future" based in part on low enrollment. Final Rule, 89 Fed. Reg. at 43,750. But the Service ignores the fact that enrollment in the 2020 CCAA increased from zero participants at the time of the Proposed Rule in July 2023 to seven participants as of February 2024. Proposed Rule, 88 Fed. Reg. at 42,673; Final Rule, 89 Fed. Reg. at 43,764. And the Service again admits the participants are required to implement avoidance and conservation measures but that it is presently "unaware of the specific conservation measures being implemented by each participant." Final Rule, 89 Fed. Reg. at 43,764.

73. Further, the Final Rule does not apply the Policy for Evaluation of Conservation Efforts When making Listing Decisions to any of these ongoing conservation efforts. This is, again, in stark contrast to the 2010 rulemaking where the Service completed a PECE analysis for the TCP. 77 Fed. Reg. 36,885. In responding to public comments regarding its failure to apply the PECE Policy

to these conservation efforts, the Service stated that "a PECE analysis was unnecessary and inapplicable" because "these conservation efforts all have a documented track record." *Id.* at 43,757. But the Service does not explain how the 2020 CCAA, for example, has a "documented track record" given its relatively recent approval in 2021 and the very recent enrollment of participants. Failure to evaluate these efforts, including the 2020 CCAA, using the PECE Policy was arbitrary and disregarded the ESA's requirements.

## C. The Rule Is Overly Vague in its Unclear Discussion of Activities that Could Result in a Take.

74.     By listing the species as endangered, the Final Rule makes it illegal to "take" a dunes sagebrush lizard. *Id.* at 43,768. A "take" includes harassing, harming, pursing, hunting, shooting, wounding, killing, trapping, capturing, or collecting an endangered species, or attempting any of these activities. 16 U.S.C. § 1532(19).

75.     The Final Rule falls short of the Service's policy to "identify, to the extent known at the time a species is listed, specific activities that will not be considered likely to result in a violation of section 9 of the Act." Final Rule, 89 Fed. Reg. at 43,768 (citing *Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions*, 59 Fed. Reg. 34,272 (July 1, 1994)). This policy requires the Service to identify activities that would result in a take "in as specific a manner as possible." Section 9 Policy, 59 Fed. Reg. at 34,272.

76.      The Final Rule states the Service is "unable to identify specific activities that will not be considered likely to result in a violation of section 9 of the Act beyond what is already clear from the Act's descriptions of prohibitions or already excepted through our regulations." Final Rule, 89 Fed. Reg. at 43,768.

77.     Instead, the Final Rule provides a list of broad and ill-defined activities that "will be considered *likely* to result in violation of section 9 of the Act." *Id.* (emphasis added). However, the Service specifically notes the list is intended to be illustrative and not exhaustive and acknowledges

additional activities may be identified, and even that some of the identified activities may not be considered likely to result in violation of section 9 of the Act. *Id.* Thus, the Final Rule is overly vague, making compliance impossible.

## CLAIMS FOR RELIEF

### Claim I: The Final Rule Violates the ESA.

78.     Plaintiff realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth in fully herein.

79.     The Final Rule's decision to list the dunes sagebrush lizard as endangered is not supported by the best available scientific and commercial data as required by the Endangered Species Act. 16 U.S.C. §1533(b)(1)(A).

80.     By failing to apply its Policy for Evaluation of Conservation Efforts When Making Listing Decisions (or a similarly robust analysis) to the existing conservation measures in place that protect the Lizard, the Service failed to comply with the ESA requirement to consider any conservation efforts being made by states or political subdivisions to protect the species. 16 U.S.C. § 1533(b)(1)(A).

### Claim II: The Final Rule is Arbitrary, Capricious, An Abuse of Discretion, or Otherwise Not in Accordance with Law, in Violation of the APA.

81.     Plaintiff realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth in fully herein.

***The Service's justification for listing the dunes sagebrush lizard is arbitrary and unreasonable.***

82.     The Service makes arbitrary assumptions about the current and future status of the dunes sagebrush lizard that formed its basis for listing the species as endangered. For example, the Service relies on a decades-old study about the impact of oil and gas well pad density on the Lizard's habitat despite the recent, widespread advancement of drilling practices that call into question the conclusions of that study as it relates to the Final Rule.

83.     The Service fails to apply the Policy for Evaluation of Conservation Efforts When Making Listing Decisions or conduct a similarly robust review of the existing conservation measures protecting dunes sagebrush lizard. This leads the Service to ignore the potential benefits of the relatively new 2020 CCAA program, which is seeing an active increase in enrollment. The Service's failure to apply the policy is in stark contrast to its application of the PECE Policy during the 2010 rulemaking, where the evaluation of the existing conservation measures ultimately led the Service to conclude it was not appropriate to list the Lizard as endangered. The Service's failure to observe its own policy in drawing its conclusions in the Final Rule is arbitrary. 5 U.S.C. § 706(2)(D).

**The Take Prohibitions of the Final Rule are vague, in violation of the APA.**

84.     The Final Rule is arbitrary, an abuse of discretion, and not in accordance with the law because it is overly vague and does not adequately describe the activities that violate the Rule. The Service does not specify the activities that will not be considered likely to result in a take, as required by the Service's own policy, resulting in an overly vague, arbitrary rule that violates the APA. 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(1)     adjudge and declare that the rulemaking titled "Endangered and Threatened Wildlife and Plants: Endangered Species Status for the Dunes Sagebrush Lizard" is unlawful because it violates the Endangered Species Act and the Administrative Procedure Act;

(2)     adjudge and declare that the Final Rule is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and otherwise contrary to constitutional rights and powers;

(3)     vacate the Final Rule;

(4)     award Plaintiff its reasonable fees, costs, expenses, and disbursements, including

attorney's fees, associated with this litigation; and

(5)     grant Plaintiff such additional and further relief as the Court may deem just, proper, and necessary.

Dated:   September 23, 2024                    Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ Clayton Smith*
Clayton Smith
Assistant Attorney General
State Bar No. 24091234
Clayton.Smith@oag.texas.gov

CLAUDIA GUTIERREZ
Assistant Attorney General
State Bar No. 24140101
Claudia.Gutierrez@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
Environmental Protection Division
P. O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel:     (512) 970-9855
Fax:     (512) 320-0911

**COUNSEL FOR STATE OF TEXAS PLAINTIFF**